## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| ELEANOR McGINN,<br>13801 York Road, M-13<br>Cockeysville, MD 21030 | **Civil Action No. 23-2609** |
| *Plaintiff*, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BROADMEAD, INC.,<br>13801 York Road<br>Cockeysville, MD 21030 | |
| SERVE ON:<br>Resagent, Inc., Resident Agent<br>7 St. Paul Street, 14th Floor<br>Baltimore, MD 21202 | |
| *Defendant*. | |

Plaintiff, Eleanor McGinn, through her attorneys, Eisenberg & Baum, LLP, states her Complaint against Defendant, Broadmead, Inc.:

### INTRODUCTION

1.      For four years running, Broadmead has been heralded as Baltimore's Best Retirement Community by the Baltimore Sun. That has not been Eleanor McGinn's experience. While residents without Celiac Disease are able to enjoy the full extent of Broadmead's services and opportunities, she cannot.

2.      Eleanor McGinn has Celiac Disease and must adhere to a strict gluten-free diet. In 2017, she paid an entrance fee of several hundred thousand dollars for Broadmead's retirement community in response to its explicit promotion and assurances of a gluten-free dietary program. According to Broadmead, it was "the mission of the Food Service Department[] to provide a quality product at all times, with emphasis placed on Special Diets"—including "Celiac." With its

1

hefty price tag, Broadmead promised a specially tailored experience: "We don't want you to just dine with us, we want you to feel like you are dining at home." Broadmead even advertised how it had "been expanding the dietary needs for Residents that require gluten free choices."

3.      Since becoming a Broadmead resident, however, McGinn has repeatedly suffered gluten poisoning because staff mishandled ingredients and mislabeled food. Before Broadmead, her sensitivity to gluten was manageable, and she was able to tolerate occasional lapses with minor inconvenience. Since her diagnosis in 1971—long before gluten-free labeling came into the public in 2014—McGinn maintained vigilance with remarkable success. In fact, gluten exposure occurred about once every ten years and was more of a gastrointestinal nuisance.

4.      In the first six months at Broadmead, McGinn was sickened six times from gluten. Her gluten reactions have become more intense over time. As a result of this heightened sensitivity, even the slightest trace of gluten sets off an attack. Gluten exposure causes her brain fog, diarrhea, excessive vomiting, weight and blood pressure fluctuations, and debilitating food anxiety.

5.      Excessive gluten ingestion has caused her unnecessary exposure to a variety of cancers and tremendous joint pathology, including severe inflammation and pain. She has suffered digestive issues and nervous system injury. Numbness and tingling in her feet are not only painful but also compromise her balance. After 50 years of diligent and successful adherence to a gluten-free diet, her quality of life has been demonstratively jeopardized, and her aging process has expedited. Before Broadmead, she had a rigorous walking regimen, but she was forced to purchase an electric scooter just to navigate the campus and retrieve mail.

6.      Because of Broadmead, her gluten sensitivity has become so heightened that one poisoning sent her to the emergency room where her excessive vomiting had affected her vagus nerve to the point where doctors could not find her pulse, and she was in a "frozen" state and

unable to speak.

7.      Broadmead's repeated playbook has been to promise future compliance. But Broadmead's actions, over a short period of time, have undermined fifty years of sacrifice, diligence, and financial investment. Broadmead has absorbed over $750,000 in McGinn's life savings, and her physical and emotional well-being have been irrevocably jeopardized. In an effort to stabilize her health, she essentially stopped eating Broadmead's meals over two years ago because otherwise she fears her life could be at risk.

8.      If McGinn knew that Broadmead could not manage gluten-free options (contrary to Broadmead's assurances), she would have never come. The cumulative impact of Broadmead's mismanagement of food services has changed a manageable dietary nuisance into a lethal crisis.

9.      McGinn brings this action seeking nominal, compensatory, and punitive damages; declaratory, injunctive, and equitable relief; and attorney's fees and costs to redress Defendant's unlawful discrimination against her on the basis of her disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*; and state and common laws.

**PARTIES**

10.      Plaintiff Eleanor McGinn is a resident of Baltimore County, Maryland, who is substantially limited in the major life activities of eating and the major bodily functions of the immune, digestive, bowel, and neurological systems. Thus, she has a "disability" within the meaning of federal civil rights laws.

11.      Defendant Broadmead, Inc. is and was at all relevant times a Maryland non-profit corporation organized as a Life Plan Community under Maryland law with its principal place of

business in Baltimore County, Maryland.

12.     Upon information and belief, Defendant is a place of public accommodation and a recipient of federal financial assistance.

13.     Medicare and Medicaid reimburse Broadmead for care that it provides to Medicare and Medicaid beneficiaries.

14.     Broadmead agreed to receive federal funds in exchange for promising to refrain from discriminating against qualified individuals with disabilities, among other reasons.

15.     The federal government has substantially performed its obligations under this contractual arrangement with Broadmead, including reimbursements for Medicare and Medicaid, and was willing and able to perform its remaining obligations.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction for the federal-law claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendant resides in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

**McGinn's disability, Celiac Disease, requires that she eat gluten-free food**

18.     After enduring three years of near-fatal symptoms and severe weight loss, Eleanor McGinn was diagnosed with Celiac Disease in 1971. Since then, she has maintained a medically necessary gluten-free diet. She is now 82 years old.

19.     Celiac Disease is an inherited, auto-immune disease affecting approximately 1% of the population. It is typically diagnosed by blood test and then confirmed by endoscopy. Celiac Disease has no known cure.

20.     The only treatment for Celiac Disease is to maintain a strictly gluten-free diet.

21.     Gluten is the name for proteins contained in wheat, barley, malt, and triticale. When a person with Celiac Disease consumes gluten, that person's body responds by attacking itself, causing damage to intestinal walls and setting off a host of symptoms that can be life-altering and life-threatening.

22.     Ingestion of gluten can occur when those who prepare food do not act with the care required causing ingestion of foods with known gluten-containing ingredients or when foods that do not contain gluten come into cross-contact with gluten when prepared using shared kitchen equipment, shared preparation surfaces, or shared utensils.

23.     McGinn has met with many doctors, including Dr. Samra Blanchard, who is the Division Head and Division Chief of Pediatric Gastroenterology at the University of Maryland. According to Dr. Blanchard, McGinn is at risk for osteoporosis, joint inflammation, other autoimmune diseases, and lymphoma if she has frequent exposure to gluten as part of her Celiac Disease.

**Broadmead advertised and promised gluten-free food**

24.     After her husband passed away, McGinn entered Broadmead, which professed in interviews and literature to offer a gluten-free menu—even one designed for Celiac Disease.

25.     During her first interview with Laurie DeLucia of the Marketing Department, McGinn explicitly stated that she was open to whatever unit size was available, but she could not compromise her gluten-free diet. She even stated that she would live in a closet as long as she

could safely eat the food.

26.     McGinn's gluten-free diet was such a priority to her that she requested to meet with Broadmead's Director of Dining before submitting a formal application for residency. Broadmead agreed and arranged this meeting with Bernard Queen. Queen assured her that the kitchen staff understood the seriousness of Celiac Disease, and Broadmead's gluten-free options were abundant, safe, and, coincidently, in an expansion mode. This expansion of gluten-free options was also touted in the literature McGinn received. It was reassuring to her that she was not the first to require or test this diet at Broadmead.

27.     After Queen left Broadmead, he wrote her a note in 2019 thanking her for the chance to discuss a "true gluten free program," underscoring his lack of understanding when he first assured her safety. He went on to state that "[i]f Broadmead would dedicate some time and effort toward the gluten diet it would please many residents presently at Broadmead and future residents."

28.     However, at the time, McGinn believed that Broadmead could safely and competently provide her with a gluten-free diet based on Broadmead's assurances.

29.     In October 2016, McGinn submitted her residency application and a non-refundable deposit to Broadmead. Soon after, Broadmead approved McGinn's application and agreed to provide her with a single occupancy unit. McGinn and Broadmead then signed a Residence and Care Agreement (the "Contract"), which formalized the terms of the parties' relationship once McGinn began her residency at Broadmead.

30.     McGinn paid Broadmead $327,371 for an entrance fee. She continues to pay over $6,500 per month. Food was her priority, not the size of her accommodation.

31.     Broadmead assured McGinn that it would provide her with safe, gluten-free food

to eat in its food venues.

32.    McGinn relied on Broadmead's assurances before entering into her contract to live at its retirement community. Specifically, she was advised by advertisements, Laura DeLucia of the Marketing Department, and then-Director of Dining, Bernard Queen, that gluten-free options were safe, abundant, and even in an expansion process. Laurie DeLucia acted as a witness to her execution of Broadmead's Residence and Care Agreement.

33.    After the contract was signed, Broadmead repeatedly served McGinn with food containing gluten despite its promises that it would serve her gluten-free foods that were safe for her to eat.

34.    Gluten is not visible, and so McGinn had no choice when eating at food venues but to rely on Broadmead's promises that it would serve her gluten-free food.

35.    Broadmead frequently mislabeled the food on published menus. At times, McGinn would find contradictory information on the posted signage and printed menus. After Bernard Queen left, she sometimes experienced pushback from Broadmead staff when she offered corrections to the signs posted in the dining room, which displayed incorrect information.

36.    As a result of eating gluten-containing foods that Broadmead served or provided her, McGinn became seriously ill.

**Broadmead repeatedly served or provided gluten-containing food to McGinn**

37.    McGinn moved into Broadmead in 2017. Throughout her time at Broadmead, McGinn has had endless conversations with staff and executives about her gluten issues, including: (1) Robin Somers, Chief Executive Officer; (2) Joyce Malone, Vice President of Facility Services; (3) Dan Hall, Director of Dining and Hospitality; (4) Jerrell Fleming, Assistant Executive Chief; and (5) Bernard Queen, the former Director of Dining.

38.     Her current health crisis did not exist when she applied for admission, and it would not exist today had she been able to rigorously follow a gluten-free diet, as promised by both the Marketing and Food Service departments.

39.     Before Broadmead, McGinn went to great lengths to preserve optimal health, spending thousands of dollars yearly for well over a decade before entering Broadmead on supplements and continues to consume them daily. She also sought holistic medicine services from a doctor, who was a Board-Certified Family Medicine Physician, and paid out of pocket.

40.     Before Broadmead, her sensitivity to gluten was mild, and her Celiac Disease was well-controlled. Since her diagnosis in 1971—long before gluten-free labeling came into the public in 2014—McGinn maintained vigilance. Gluten exposure occurred about once every ten years and was more of a gastrointestinal nuisance. Despite vomiting intensely each time, she was able to recover much more quickly and suffered fewer overall symptoms afterward. Nor did she develop the food anxiety that she has today because she could pinpoint the error and believed she could successfully avoid it in the future.

41.     In the first six months at Broadmead, McGinn was sickened six times from gluten. Her gluten exposure has had a compounding toxic effect, resulting in more intense gluten reactions over time. As a result of this heightened sensitivity, even the slightest trace of gluten sets off an attack.

42.     These lapses continued throughout her residency at Broadmead. In February 2018, for example, McGinn was served a crab cake presented as "gluten free"—it was not. She became very ill and did not know exactly why. She refused to eat another again. Three years later, McGinn learned that chef Jerrell Fleming had been using commercial Rice Krispies as a filler, and commercial Rice Krispies contains malt, which is a source of gluten. At the time, however, the

chef insisted to her that the crab cake was gluten-free.

43.     On January 19, 2019, McGinn emailed Director of Dining, Dan Hall, a list of various gluten-free products. But no meaningful changes took place. For instance, in June 2020, McGinn was served a stuffed tomato labeled as gluten-free—it was not. After eating it, she developed severe bloating and pain in her stomach followed by vomiting, diarrhea, exhaustion, and very severe rashes on her legs. Her leg needed to be medicated and covered in Vaseline and Saran Wrap to avoid a recurring episode of cellulitis, which has hospitalized her in the past. The leg rashes and Saran wrapping went on for at least two years. Ever increasing strengths of corticosteroid creams (Triamcinolone Acetonide, Betamethadonen Dipropionate Ointment USP, 0.05%, and Diclofenac Sodium Topical Gel) were prescribed by a dermatologist who told her to cover the steroid cream with Vaseline and Saran Wrap every day. The leg rashes were either directly connected to gluten exposure itself or caused indirectly from the mental and physical stress. McGinn contacted Dan Hall, who could not identify the person responsible for the mislabeling. He stated that one of three to four people could have made the mistake depending on who was working at the time.

44.     In January 2021, she consumed chicken marsala that the print menu claimed to be gluten-free. McGinn later learned that the dish was excluded from the gluten-free options on the online menu because it contained gluten. Broadmead's indifference and carelessness continued as evidenced by the fact that in 2022, McGinn saw that chicken marsala was still erroneously listed as gluten-free.

45.     McGinn reported this latest exposure to Broadmead's Vice President of Facilities Services, Joyce Malone, who claimed to be "horrified and sad" to learn of this latest exposure. Malone asked the head chef to determine why these errors persisted and scheduled a telephone call

with McGinn and the head chef. During that phone call, the head chef admitted that Broadmead kitchen staff were not trained on gluten cross-contamination (i.e., using the same utensils to prepare gluten-containing and gluten-free food). McGinn requested that Broadmead stop billing her each month for a meal plan that she could not use.

46.     The consequences of gluten exposure can be lethal. On one occasion, a Broadmead nurse named Heather thought McGinn was having a massive heart attack and sent her to the emergency room. She learned that her excessive vomiting had affected her vagus nerve to the point where doctors could not find her pulse, and she was in a "frozen" state, which left her immobilized except for shivering that was so violent that her teeth were cracking together. McGinn later learned that she was lucky to have recovered because a "freeze" may last indefinitely. Her hospitalization also resulted in two years of bladder infections, visits to a urologist, and invasive tests. Then in early 2021, following a gluten exposure, she refused to go to the hospital because she was so weak and physically compromised that she could not risk any possible exposure to COVID-19.

47.     At Broadmead, the most important contact with other residents is during meal time. But McGinn's dining experience often became uncomfortable and embarrassing. For instance, if McGinn had to halt the evening buffet line to inquire about the contents of an item, the experience was awkward as diners behind her expressed impatience and occasionally exasperation with such delays. Residents without Celiac Disease do not have to investigate every item that they consume.

48.     Relatedly, it was unpleasant for McGinn to order food that was not presented because it was time-consuming. By the time she rejoined other residents at the table, they were finishing dessert, and she was deprived of this social outlet.

49.     Eventually, McGinn stopped going altogether. As time went on, some residents would stop her throughout Broadmead and ask where she has been. Others sadly passed away.

50. McGinn has constantly requested a broad range of gluten-free options, but Broadmead offered cold comfort. For example, in a letter dated March 18, 2021, CEO Robin Somers referred to "a daily menu of grilled and freshly steamed meats, fish, and vegetables." Based on this letter, McGinn learned that she was fighting a losing battle all along. Residents without Celiac Disease do not have to subsist on repetitive plain food.

51. The gluten-free bread options are limited. Generally, if McGinn wanted bread, she would first need to locate a server who was even aware of the existence of the freezer in the kitchen where gluten-free burger and hot dog buns were stored. This required a lengthy explanation of what she was searching for. The actual retrieval process then began either by the server or someone else who could be found who actually knew where to look. Often, this individual might return with a hot dog bun because that was all they could find or no bun because there were none available. No one could ever tell McGinn when reordering might happen. It would have been time consuming to have the bun warmed, but she also could not trust the toaster oven to be gluten-free. By contrast, residents without Celiac Disease have a wide assortment of breads and desserts to choose from. Those residents can dine on biscuits, croissants, corn bread, garlic bread, cranberry bread, blueberry muffins, Italian bread, artisan rolls, soft dinner rolls, and so on.

52. The gluten-free dessert options are also limited. They are often prepackaged goods, which are expedient but sugar laden. Residents without Celiac Disease can enjoy pecan pie, apple pie, pumpkin pie, fudge brownies, carrot cake, chocolate layer cake, peanut butter cake, chocolate mint pie, red velvet cake, black forest cake, and more.

53. McGinn has never tasted soup at Broadmead because although they are advertised as gluten-free, she cannot trust that the soups actually are given her past exposure. Nor has she ever enjoyed a seasonal pie during Thanksgiving or Christmas because no gluten-free options are

11

available.

54.     Broadmead also introduced a new dining venue called the Bistro for lunch, casual dining, and parties, but it has no gluten-free options when McGinn checks the menu. As a constant theme, dining at Broadmead has undermined her health and offered meager benefits.

**McGinn's need for accommodations was known or should have been known**

55.     As is plain from her disability, McGinn repeatedly requested reasonable accommodations throughout her time at Broadmead, and her need for such accommodations was also obvious. These accommodations were outright denied and unreasonably delayed. She has consistently requested a reasonable range of safe, gluten-free options, such as bread products, pastries, desserts and pasta entrees. There is a wide disparity between the number of options available to residents with Celiac Disease and the number of options for residents without Celiac Disease.

56.     On March 3, 2023, McGinn issued a letter to CEO Robin Somers reiterating various requests. Somers responded by letter ten days later. Somers denied McGinn's request for financial compensation in the form of the return of her entrance fee, construction costs, and all meal charges incurred.

57.     Somers also denied McGinn's request that Broadmead submit to a recognized, mutually acceptable food certification program in which McGinn could participate. Relatedly, McGinn learned that Broadmead recently approved an expenditure of $6,500 from the corporate budget to further enhance the walls of the Bistro. From the very beginning, McGinn made clear that safe food was her primary and ultimate goal, and she was assured verbally and through advertising that meals were safe for those with Celiac Disease like her.

58.     McGinn and Somers exchanged further correspondence on two other requests.

First, McGinn renewed her request for a reasonable range of safe, gluten-free options, such as bread products, pastries, desserts and pasta entrees. Somers noted that Broadmead offers "many gluten-free options," attaching the Spring Cycle Menu. The menu covers a period of 91 days over a span of 13 weeks. During those 91 days, there are no gluten-free bread products and only two gluten-free dessert offerings for a brief period of time. By contrast, residents without Celiac Disease are free to enjoy 28 bread products and 26 different desserts, and McGinn is required to subsidize them all. Other residents have the option to enjoy a full-course meal, and to make matters worse, the Spring Menu contains a number of pasta entrees, none of which are gluten-free. McGinn has paid the same amount as others for food at Broadmead, but she does not have as many options as those residents without Celiac Disease when it comes to such dining choices.

59.     Finally, McGinn requested to opt-out of her Residence and Care Agreement meal plan. Somers stated that she would "honor this request in the form of applying a 3-meal per day Away Meal Credit." However, McGinn is currently unwilling to consume any meals there because of her repeated exposure to gluten, and the Away Meal Credit is a small fraction of the cost of a meal at Broadmead.

**As a result of Broadmead's actions and inactions, McGinn suffered severe physical, financial, and emotional harm**

60.     As a result of Broadmead's failure to provide safe food options and repeatedly exposing her to gluten, McGinn suffered severe physical, financial, and emotion harm, including but not limited to humiliation, frustration, and emotional stress. Her health has been irreparably compromised, and her retirement funds have been depleted.

61.     Each gluten exposure leaves McGinn sickened for days and results in violent vomiting. She develops severe rashes on her legs and canker sores in her mouth.

62.     Her gluten exposure at Broadmead, either directly or indirectly based upon the

extreme stress she suffered, has contributed to joint pain and atrial fibrillation (A-fib) attacks. She also experienced leg cramps and bone pain. The stress has caused muscle tenseness, which formed into painful knots. The pain was so excruciating that McGinn could not turn her head.

63.     McGinn was referred by her physical therapist at Broadmead to Margaret Winters, D.C. who has a clinic called Great River Chiropractic Clinic, LLC. McGinn began going two to three times a week hoping for some relief and paying out of pocket for each visit. She also underwent lots of physical therapy and visited Dr. Thelma Wright, a pain medicine specialist, at the University of Maryland Rehabilitation Center in February 2022. Her mobility continued to be extremely painful due to inflammation in both knees and a large Baker's cyst behind the right one. The Baker's cyst was intolerable for over two years before it resolved, and McGinn's knees remain an issue.

64.     Her blood pressure has fluctuated at Broadmead. When McGinn first moved to Broadmead, her blood pressure was 106/60. Four months later, her blood pressure increased to 120/76. In October 2020, her blood pressure increased to 142/82. Three months later, Plaintiff's blood pressure increased to 143/65.

65.     In the last two years, she lost 25 pounds.

66.     McGinn has paid for a full menu at Broadmead while a full gluten-free menu has never existed. This reality bears no resemblance to the interviews and literature made available to her as a prospective resident.

67.     Following her repeated gluten poisonings at Broadmead, she sobbed out of disappointment and fear of the future for the first time since her Celiac diagnosis. In fact, her experience at Broadmead reminds her of the time before she was diagnosed with Celiac Disease where she lost total control of her health. In 1968, three years before her diagnosis, she believed

she would die if she could not find a remedy. Her episode in the emergency room—paralysis combined with an inability to speak—has been a reoccurring nightmare.

68.     McGinn also lost considerable financial resources. She became a resident of Broadmead with the expectation that she would remain in the community until death. She did not want to impose the stress of care on her family as she aged and became a resident at Broadmead after staff's representations about safe gluten-free meals. Accordingly, she spared no expense in the construction of her new Broadmead residence, adding an extension, eliminating a living room to accommodate a large—and costly—island full of kitchen cabinetry as well as a deep freezer and a second built-in refrigerator.

69.     In addition, McGinn has developed a debilitating case of food anxiety. Before Broadmead, she never had food anxiety despite the fact that when she was diagnosed there were no labeling laws and few gluten-free grain products on the market. Now her anxiety rules much of her social behavior. Her sensitivity to gluten has risen exponentially to the point that she continues to avoid restaurants and dinner invitations to others' homes. Forced into survival mode because of Broadmead, she even purchases and prepares 99% of her meals in her own kitchen and dines alone, whether at Broadmead or elsewhere.

70.     McGinn was deprived of the full and equal enjoyment of Broadmead's benefits and services. Specifically, she did not receive a "like experience" as compared to non-disabled residents who receive full benefits and services from Broadmead. Accordingly, McGinn had an expectation interest of full inclusion. McGinn should receive expectation-interest damages to give her the benefit of her bargain by awarding her a sum of money that will, to the extent possible, put her in as good a position as she would have been in had the contract been performed.

71.     In failing to provide such equal treatment and failing to make reasonable

accommodations despite notice, Broadmead intentionally discriminated against McGinn and acted with deliberate indifference to her federally protected rights.

72.     Broadmead's discrimination against McGinn not only caused physical and emotional distress but violated her civil rights. She is at constant risk of having no safe access to food at all if she needs to be placed in increased care settings at Broadmead. Specifically, if she becomes unable to physically prepare or source her own good, she is at very significant risk with no ability to safely eat.

73.     McGinn seeks damages for her pain and suffering.

74.     McGinn seeks any and all remedies available under contract law, including expectation-interest damages and specific performance.

75.     McGinn has no adequate remedy to fix her physical health, and Broadmead was unjustly enriched through its failure to provide a full menu of gluten-free options and otherwise saved those costs throughout McGinn's stay by not buying gluten-free products.

76.     Based on McGinn's experience, it is evident that Broadmead has failed to implement proper policies, procedures, trainings, and practices respecting the civil rights and communication needs of individuals with Celiac Disease.

77.     Broadmead knew or should have known of its obligations under federal antidiscrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations to ensure equal communication, participation, and treatment of individuals with Celiac Disease.

78.     Broadmead knew or should have known that its actions and inactions created an unreasonable risk of causing McGinn greater levels of physical and emotional distress than a person without Celiac Disease would be expected to experience.

79.    As a result of Broadmead's failure to accommodate McGinn, she received services that were objectively substandard and that were inferior to those provided to residents without Celiac Disease.

## CAUSES OF ACTION

### CLAIM I:    Violations of Title III of the Americans with Disabilities Act

80.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

81.    At all times relevant to this action, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, has been in full force and effect and has applied to Broadmead's conduct.

82.    At all times relevant to this action, McGinn has been substantially limited in the major life activity of eating and the major bodily functions of the immune, digestive, bowel, and neurological systems. Thus, she has a disability within the meaning of the ADA. 42 U.S.C. § 12102(2).

83.    Broadmead owns, leases, or operates a place of public accommodation within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(F).

84.    Title III of the ADA provides that no "individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

85.    Title III of the ADA defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of

auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

86. Under Title III of the ADA, it "shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

87. Broadmead discriminated against McGinn on the basis of her disability in violation of Title III of the ADA and its implementing regulations.

88. Under Title III of the ADA, McGinn was "treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

89. Broadmead has failed to implement policies, procedures, and training of staff necessary to ensure compliance with Title III of the ADA and its implementing regulations.

90. McGinn is entitled to injunctive relief and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)–(2); 42 U.S.C. § 2000a-3.

**CLAIM II:   Violations of Section 504 of the Rehabilitation Act**

91. McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

92. At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendant's conduct.

93. At all times relevant to this action, McGinn has had substantial limitations to the major life activities eating and the major bodily functions of the immune, digestive, bowel, and neurological systems. Thus, she has been an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9); 42 U.S.C. § 12102(2).

94. At all times relevant to this action, Broadmead has been a program or activity

receiving federal financial assistance under 29 U.S.C. § 794(b).

95.     Section 504 of the Rehabilitation Act provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

96.     Under the Rehabilitation Act, federal regulations define discriminatory actions to include "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 45 C.F.R. § 84.4(b)(1)(ii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendant.

97.     Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from "otherwise limiting a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 45 C.F.R. § 84.4 (b)(1)(vii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendant.

98.     Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from "[a]fford[ing] a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons". 45 C.F.R. § 84.52(a)(2). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendant.

99.     Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from providing services and benefits "in a manner that limits or has the effect of limiting the participation" of the person with a disability. 45 C.F.R. § 84.52(a)(4). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendant.

100.    Broadmead discriminated against McGinn solely on the basis of her disability by

denying her meaningful access to the services, programs, and benefits Broadmead offers to other individuals and by refusing to provide auxiliary aids and services necessary to ensure full inclusion in violation of Section 504 of the Rehabilitation Act.

101.   Broadmead has failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Rehabilitation Act and its implementing regulations.

102.   Broadmead intentionally discriminated against McGinn and acted with deliberate indifference to her federally protected rights failing to provide equal treatment and failing to make reasonable accommodations despite notice of her needs.

103.   McGinn is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss he sustained as a result of Broadmead's discriminatory conduct and deliberate indifference under 29 U.S.C. § 794a.

104.   The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

105.   Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

106.    As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

107.    42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

### CLAIM III:   Violations of the Fair Housing Act

108.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

109.    This action is brought to enforce the requirements of the FHA, 42 U.S.C. § 3604, *et. seq.*

110.    Broadmead owns and/or leases dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

111.    The FHA applies to all dwellings "*except as exempted by sections 803(b) [§ 3603(b)] and 807 [§ 3607] of this title.*" 42 U.S.C. § 3604 (emphasis added); *see also* 42 U.S.C. § 3603(a) (stating that upon enactment, the FHA's prohibition of discrimination in the sale or rental of dwellings would immediately cover four types of dwellings, and after December 31, 1968, such coverage would extend to "all other dwellings except as exempted by [Section 3603(b)]").

112.    The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

113.    Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

114.    McGinn requested and was denied reasonable accommodations, which would have allowed her access and an opportunity to participate, use and enjoy services provided by Broadmead's facilities that are connected to their dwellings and which equally situated residents without Celiac Disease are able to enjoy.

115.    Broadmead discriminated against her on the basis of her disability in violation of the above-cited provisions of the FHA.

116.    McGinn is an aggrieved person within the meaning of 42 U.S.C. § 3602(i) and has suffered from emotional distress as a result of Broadmead's discriminatory conduct.

117.    McGinn is therefore entitled to nominal damages as a result of Broadmead's discriminatory conduct pursuant to 42 U.S.C. § 3604, *et. seq.*

118.    McGinn is further entitled to entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

**CLAIM IV:   Breach of Contract**

119.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

120.    McGinn and Broadmead entered into the Contract, which clearly states that "Broadmead serves three nutritional and properly cooked meals a day from a choice of well-balanced menus." The operative terms are "properly cooked meals" and "well-balanced menus."

121.    A material term of the contract was Broadmead's explicit promise to McGinn that

Broadmead would ensure that the food was gluten-free and safe for her to eat.

122.    McGinn relied on Broadmead's explicit promises in entering into the Contract with Broadmead.

123.    Broadmead breached the Contract on multiple occasions by providing McGinn with food that contained gluten and was not safe to eat.

124.    As a direct result of Broadmead's actions, McGinn suffered physical, emotional, and financial harm and is entitled to damages.

**CLAIM V:    Negligence**

125.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

126.    Broadmead owed McGinn a duty of care in ensuring that all food prepared for her was safe for her to eat.

127.    Broadmead owed McGinn a duty of care in ensuring that foods prepared for her were free of gluten to which Broadmead knew she could not eat.

128.    Broadmead had notice of McGinn's Celiac Disease and nonetheless repeatedly served her foods containing gluten.

129.    Broadmead failed to act as the ordinary, reasonably prudent food preparer would under the same or similar circumstances.

130.    Broadmead failed to exercise ordinary and reasonable care to ensure that the food was free of gluten and safe for McGinn to consume.

131.    Broadmead failed to maintain policies and practices to ensure the safe handling of food orders for McGinn.

132.    As a direct result of Broadmead's actions, McGinn suffered physical, emotional,

and financial harm and is entitled to damages.

## CLAIM VI:   Negligent Misrepresentation

133.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

134.    Broadmead owed McGinn a duty of care in ensuring that all food prepared for her was safe for her to eat.

135.    Broadmead owed McGinn a duty of care in ensuring that foods prepared for her were free of gluten to which Defendants knew she could not eat.

136.    Broadmead had notice of McGinn's Celiac Disease and nonetheless served her foods containing gluten.

137.    Broadmead failed to act as the ordinary, reasonably prudent food preparer would under the same or similar circumstances.

138.    Broadmead failed to exercise ordinary and reasonable care to ensure that the food was free of gluten and safe for McGinn to consume.

139.    Broadmead failed to maintain policies and practices to ensure the safe handling of food orders for McGinn.

140.    McGinn reasonably relied on Broadmead's representations because she had repeatedly notified Broadmead that she has Celiac Disease and cannot eat gluten, and Broadmead had promised to prepare gluten-free food safe for her to eat.

141.    As a direct result of Broadmead's actions, McGinn suffered physical, emotional, and financial harm and is entitled to damages.

## CLAIM VII:  Breach of Express Warranty

142.    McGinn incorporates by reference all preceding paragraphs and realleges them in

support of this claim.

143.    McGinn put Broadmead on notice of her Celiac Disease and medical need to eat gluten-free food.

144.    Broadmead, after receiving such notice, promised McGinn that it would prepare gluten-free food safe for her to eat.

145.    McGinn reasonably relied on Broadmead's promises that it would prepare gluten-free food safe for her to eat.

146.    McGinn reasonably relied on Broadmead's promises when she ate food prepared for her by Broadmead.

147.    As a result of McGinn's reliance on Broadmead's promises, she ate gluten-containing foods and suffered physical, emotional, and financial harm.

148.    As a direct result of Broadmead's actions, McGinn suffered physical, emotional, and financial harm and is entitled to damages.

### CLAIM VIII: Breach of Implied Warranty of Merchantability

149.    McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

150.    Broadmead is engaged in the business of preparing food for consumption.

151.    Broadmead impliedly warranted that the products were of merchantable quality.

152.    Broadmead impliedly warranted to McGinn that the food prepared for her did not contain gluten, and McGinn would not have reasonably expected to find gluten in her food.

153.    McGinn reasonably relied on Broadmead's assurances and skill in preparing food in believing that the food would not contain gluten and would be safe for her to eat.

154.    Broadmead placed the gluten-containing ingredients into McGinn's food when it

knew or should have known of the danger this posed to her.

155.     Broadmead's actions preparing "gluten-free" food that contained gluten rendered such "gluten-free" food unfit for the ordinary purposes for which such food is intended (i.e., consumption by individuals who cannot have gluten).

156.     Broadmead's actions in making and serving the contaminated, dangerous and defective food for McGinn were inherently defective and dangerous.

157.     A person would not reasonably expect to find gluten in food after repeatedly telling Broadmead about Celiac Disease and requesting that there be no gluten-containing ingredients.

158.     Since Broadmead accepted and prepared the food orders knowing about McGinn's Celiac Disease and gluten sensitivity, a reasonable person would expect that there would be no gluten in the food.

159.     As a direct result of Broadmead's actions, McGinn suffered physical, emotional, and financial harm and is entitled to damages.

**CLAIM IX:   Breach of Implied Warranty of Fitness for a Particular Purpose**

160.     McGinn incorporates by reference all preceding paragraphs and realleges them in support of this claim.

161.     Broadmead is engaged in the business of preparing food for consumption.

162.     Broadmead impliedly warranted to McGinn that the food prepared for her did not contain gluten, and McGinn would not have reasonably expected to find gluten in her food.

163.     Broadmead impliedly warranted fitness for a particular purpose when it accepted and fulfilled requests for gluten-free food with clear notice that the food was for McGinn who has Celiac Disease and cannot eat gluten.

164.     McGinn reasonably relied on Broadmead's assurances and skill in preparing food

in believing that the food would not contain gluten and would be safe for her to eat.

165.    Broadmead placed the gluten-containing ingredients into McGinn's food when it knew or should have known of the danger this posed to McGinn.

166.    Broadmead's actions preparing food for McGinn that contained gluten rendered such food unfit for the particular purpose for which such food was intended (i.e., consumption by McGinn who cannot consume gluten).

167.    Broadmead's actions in making and serving the contaminated, dangerous and defective food for McGinn were inherently defective and dangerous.

168.    A person would not reasonably expect to find gluten in food after repeatedly telling Broadmead about Celiac Disease and requesting that there be no gluten-containing ingredients.

169.    Since Broadmead accepted and prepared the food orders knowing about McGinn's Celiac Disease and gluten sensitivity, a reasonable person would expect that there would be no gluten in the food.

170.    As a direct result of Broadmead's actions, McGinn suffered physical, emotional, and financial harm and is entitled to damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Eleanor McGinn respectfully requests that this Court:

A.    Issue a declaratory judgment that Defendant subjected Plaintiff to physical, financial, and emotional harm in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, and state and common law.

B.    Issue an injunction ordering Defendant to:

   i.    Provide a reasonable range of safe, gluten-free options, such as bread products, pastries, desserts and pasta entrees, and

ii.   Submit to a recognized, mutually acceptable food certification program, which would include oversight and a gap analysis, in which McGinn could participate.

C.  Award to Plaintiff:

i.   Nominal damages;

ii.   Compensatory damages;

iii.   Punitive damages;

iv.   Reasonable costs and attorney's fees;

v.   Interest on all amounts at the highest rates and earliest dates allowed by law; and

vi.   Any and all other relief that this Court deems just and appropriate.

Dated: September 26, 2023                              Respectfully submitted,

 _/s/ Andrew Rozynski_____
Andrew Rozynski (Bar No. 30787)
David John Hommel (seeking admission *pro hac vice*)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
dhommel@eandblaw.com
*Attorneys for Plaintiff*